UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

ROY J. JOHNSON,                           )
NANCY C. JOHNSON, and                     )
MICHAEL and RAVEN MCCARROLL,              )
as next friends of FELICITY GRACE         )
MCCARROLL, a minor,                       )
                                          )
       Plaintiffs,                        )
                                          )     No. 2:09-CV-142
                                          )     (GREER/SHIRLEY)
V.                                        )
                                          )
ELECTROLUX HOME PRODUCTS, INC.,           )
                                          )
       Defendant.                         )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), the Rules of this Court, and the referral of the District Court for disposition of pretrial motions. Now before the Court is Defendant Electrolux's Motion to Exclude Testimony of Plaintiffs' Putative Expert Roland Chretien, III, [Doc. 91]. On June 27, 2011, the Court held a hearing to address these and other pending motions. Attorney William J. Taylor was present representing the Plaintiffs. Attorneys David S. Osterman and Daniel C. Headerick were present representing Defendant Electrolux Home Products, Inc., ("Electrolux").

The Court finds that the Motion to Exclude Testimony of Plaintiffs' Putative Expert Roland Chretien, III, is now ripe for adjudication, and for the reasons stated below, it is **GRANTED**.

## I.  BACKGROUND

The background and procedural posture of this matter are familiar to the Court and the parties and has been summarized in the Court's previous Order [Doc. 105 at 2].  At this juncture, it will suffice to state that Plaintiffs claim that a range manufactured by the Defendant produced formaldehyde and caused personal injury to their persons and damaged both their real and personal property.

## III.  APPLICABLE LAW

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the United States Supreme Court confirmed that a trial court should serve as a gatekeeper in regards to proposed expert testimony, and should prevent the jury from being overwhelmed by unsupportable speculation cloaked as expertise. 509 U.S. at 595-96.  In response to <u>Daubert</u> and subsequent decisions, Rule 702 of the Federal Rules of Evidence has been amended and now provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The <u>Daubert</u> "gatekeeping" obligation applies not only to "scientific" testimony, but to all expert testimony.  <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 151-52 (1999).

## IV. ANALYSIS

With the applicable law in mind, the Court turns to the Defendant's challenges to the testimony of Roland Chretien, III. The Defendant seeks to exclude the testimony of Mr. Chretien on several fronts, and the Court will discuss each of these grounds for exclusion as raised in the Defendant's Motion to Exclude [Doc. 91] and Memorandum in Support [Doc. 92].

### A. Testimony Regarding Medical Causation

The Defendant first seeks to exclude any testimony or expert opinions offered by Mr. Chretien regarding medical causation. The Defendant claims Mr. Chretien possesses no medical knowledge or qualifications to offer such testimony. The Defendant alleges that Mr. Chretien seeks to introduce opinions regarding "medical causation between formaldehyde exposure and [Plaintiffs'] alleged injuries." [Doc. 92 at 1]. The Defendant references Mr. Chretien's Affidavit at Paragraph 14 [Doc. 92 at 2], which reads:

> It should also be noted that some individuals may experience discomfort or even more serious adverse health effects when exposed to a chemical substance at the TLV [(threshold limit value)], or even at concentration below the TLV. There are numerous possible reasons for increased susceptibility to chemical substance, including age, gender, ethnicity, genetic factors (predisposition), lifestyle choices (e.g., diet, smoking, abuse of alcohol and other drugs), medications, and pre-existing medical conditions (e.g., aggravation of asthma or cardiovascular disease), according to the ASGIH [(American Conference of Industrial Hygenists)], Threshold Limit Values for Chemical Substances and Physical Agents & Biological Exposure Indices, . . . .

[Doc. 86 at 18-19].

In Plaintiffs' response to Defendant's motion [Doc. 95], the Plaintiffs neither address nor offer any rebuttal to this particular issue nor did they at the hearing.

3

The Court agrees that Plaintiffs have not established Mr. Chretien possesses the requisite knowledge or qualifications or the necessary factual basis to be qualified to offer any expert opinion testimony regarding medical causation. The issue is whether paragraph 14 of Mr. Chretien's Affidavit purports to actually introduce medical causation opinion testimony between formaldehyde exposure and Plaintiffs' alleged injuries as alleged by the Defendant.

Initially, it is hard to conclude that it offers medical causation evidence since paragraph 14 does not mention formaldehyde, formaldehyde exposure, the Plaintiffs, or the Plaintiffs' injuries. Rather, it is fraught with generalities – *e.g.*, "<u>some</u> individuals," "<u>may</u> experience," "adverse health effects," following exposure to "<u>a</u> chemical substance," at or below the threshold limit value for "chemical substances," and there are "<u>numerous possible</u> reasons for increased susceptibility to a chemical substance," a phrase which is followed by a listing of such possibilities despite none of these possibilities having been mentioned by the Plaintiffs. [Doc. 86 at 18-19 (emphasis added)].

It does appear that Mr. Chretien, in paragraph 14 of his Affidavit, is attempting to offer some medical causation testimony, albeit, arguably irrelevant based on its overly generalized and speculative nature. However, based on the motion, the Plaintiffs lack of rebuttal, and the fact that the opinion does to some degree intrude into issues regarding medical causation opinions on which Mr. Chretien is not qualified to testify, the Court agrees that Mr. Chretien may not testify as to matters regarding medical causation. Mr. Chretien is precluded from testifying as to the matters contained in paragraph 14 of his Affidavit. He is also precluded from offering any other expert opinion testimony regarding medical causation concerning the effects of alleged formaldehyde exposure to the Plaintiffs or the level of exposure that could have caused the Plaintiffs alleged injuries.

4

### B. Testimony Regarding the Source of Formaldehyde

The Defendant next contends that Mr. Chretien's opinions regarding the Tappan range being the main source of formaldehyde has no factual or scientific basis. The Defendant maintains that the alleged amount of formaldehyde to which the Plaintiffs were allegedly exposed were derived by using a photoionization detector (PID), which measures *all* volatile organic compounds (VOCs) in parts per billion not just formaldehyde levels.

The Defendant argues that this PID cannot differentiate or discern formaldehyde from other compounds and is incapable of accurately determining formaldehyde concentration in the presence of other VOCs. In support of this contention, the Defendant cites the Court to its expert Tony Watson's Affidavit [Doc. 73-3 at ¶ 23], which states that the "meter used by Mr. Chretien is not capable of accurately determining the formaldehyde concentration in the presence of other VOCs." The Defendant also references the report of the Plaintiffs' other expert Scott VanEtten, who also stated in his report that the PID device used by Mr. Chretien "is a general VOC detection system and cannot distinguish between any individual VOC but groups the concentrations into one signal." [Doc. 70-1 at 6].

In Plaintiffs' response to this issue, Plaintiffs argue that: (1) Mr. Chretien used "reliable test apparatus and methods to reach his conclusions"; (2) Mr. Chretien PID readings were compared to lab results from air sampling performed during the investigation which were similar to each other when performed inside and outside the house without the range being on; and (3) A "break through" in the air sampling test helped determine precisely where the contaminations were and what the contaminate was. [Doc. 95 at 3-6].

Initially, the Court notes that in his report, Mr. Chretien's opinion regarding the Tappan range being the source of formaldehyde is not followed by any basis for that statement. What follows instead is a reference to a "repetitive noise," a potential faulty relay, and a hypothetical opinion regarding potential formaldehyde levels if the range were to heat and certain temperatures. There is simply no basis stated for the opinion in his report. The Court notes that Plaintiffs' arguments, as stated, might be somewhat attractive as to Mr. Chretien's methodology, if they were accurate and if supported by the evidence presented. However, as noted herein, upon closer scrutiny they appear to be neither.

With regard to Plaintiffs' contention that Mr. Chretien used "reliable test apparatus and methods to reach his conclusions," the Court notes that this is a bare, unsupported, and conclusory statement from Plaintiffs' counsel. Other than reciting from Mr. Chretien's report and the description of the apparatus used, there is nothing proffered or provided to establish such apparatus and methods are in fact reliable. If it had not been contested, the Court might ordinarily accept such apparatus as reliable, but in the face of evidence contending they are not reliable in measuring, discerning, and distinguishing formaldehyde, the compound at issue,[1] more is required than Plaintiff's mere self-serving, conclusory contention.

Furthermore, the PID could arguably be a reliable test apparatus in measuring total VOCs, but its ability to measure VOCs begs the question as to whether it is reliable in measuring formaldehyde. The Plaintiffs provide no rebuttal to this argument nor do they contest the statement of Defendant's expert Mr. Watson and their own expert Mr. Van Etten, to the contrary. Accordingly,

---

[1] See Joint Pleading in Regard to Items to be Incorporated Into the Final Pretrial Order, Doc. 103 at 2.

this argument lacks support in the record, and it is, therefore, unavailing.

With regard to the Plaintiffs next argument regarding alleged similarities in Mr. Chretien's test results upon comparison of lab results from other air sampling tests inside and outside the house while the range was turned off, the Plaintiffs cite only to Mr. Chretien's expert report and his Affidavit.

Initially, the Court would note that such generalized references without specifying the supporting statement or specific location of the statement is improper. The Plaintiffs do not reference specifically what they are talking about, what "lab results," or what air sampling results are referenced, or the actual levels involved. Essentially, Plaintiffs ask the Court to plow through these documents looking for the lab results referenced and conduct its own comparison. While it would be sufficient for the Court to decline, in the interest of fairness to the Plaintiffs, the Court has done just that.

In reviewing Mr. Chretien's expert report, cited as support for this contention, the Court cannot find any reference to any lab results or any air sampling test results conducted by anyone, including Mr. Chretien. There are no VOC or formaldehyde levels stated in parts per billion or parts per million, or in any other form. While various exposure limits are stated, no results of air sampling tests are provided at all. While the Court acknowledges air sampling results may exist in the report's reference to various "attached documentation," none is cited to the Court, and no "attached documentation" was provided to the Court. Accordingly, the report as provided contains no support for the Plaintiffs' contention.

In reviewing Mr. Chretien's Affidavit, the only air sampling levels reported are those he conducted. There is no comparison mentioned or referenced by Mr. Chretien. There are no

7

references to lab results or other air sampling test results from which the Court could conduct a comparison with Mr. Chretien's results. Thus, in neither document is there any reference or evidence that Mr. Chretien's PID readings "provided readings that were compared to lab results from the air sampling performed during the course of the investigation," let alone that they provided similar results.

The Court needs to address one further point in this issue. The Plaintiffs make the comparison argument apparently to bolster the legitimacy of Mr. Chretien's results. However, even if some other air sampling results, taken inside and outside the house, while the range was off were to some degree similar, that fact alone would not suffice to either establish the accuracy of the PID measurements or address the issue that the PID device cannot differentiate, distinguish, or discern formaldehyde from other VOCs.

Plaintiffs' sole argument in this regard is, "This combination, arguably, eliminates the probability that another contaminate, other than formaldehyde, even needed to be addressed. This is a logical conclusion based on the manner in which the testing was performed, and the samples were obtained from such testing." [Doc. 95 at 4]. There are so many problems with this statement that it is hard to know where to begin. Initially, it does not make much sense to the Court. Second, the Court does not understand what "[t]his combination" refers to or why some arguable similarity in prior air sampling tests, inside and outside, with the stove off "arguably, eliminates the probability that another contaminate, other than formaldehyde" was detected. Nor was the Court provided with or referenced to any evidence regarding the manner in which the testing by Mr. Chretien or others was performed.

The biggest problem though is that the Plaintiffs' argument that the combination eliminates the need for further discussion. First, this is a statement from Plaintiffs' attorney not an expert. Second, there is no basis or support given for such a blanket contention. Third there is no basis for why or how "[t]he combination" would, could, or should eliminate the probability of another contaminate other than formaldehyde being detected. Fourth, even if this statement were attributable to an expert, the Court would require some basis and support for that contention. For all those reasons, this argument is unavailing.

Finally, the Plaintiffs take issue with the Defendant's contention that Mr. Chretien's use of the total VOC measurement – as opposed to only measuring formaldehyde levels and then characterizing them as formaldehyde levels – is misleading. Plaintiffs contend that the Defendant has misinterpreted Mr. Chretien's report. Specifically, Plaintiffs state, "As referenced in the report, general area air sampling was performed and isolation of the *area* of contaminates of concern were sought." [Doc. 95 at 4-5 (emphasis in original)]. The Plaintiffs continue, "A 'breakthrough' helped determine precisely where contaminates were (in this case, closest to the Tappan range), and what contaminate it actually was." [Doc. 95 at 5]. The Plaintiffs contend this was a methodical approach by Mr. Chretien to determine the sources of the contaminates. As with the previous contention by the Plaintiffs, there is absolutely no specific references to where in Mr. Chretien's report this is found or where these contentions are supported.

The Court finds, upon review of Mr. Chretien's entire report, that there is no reference that general sampling was performed to isolate the area of contaminates of concern. There is no reference to where air sampling was performed and no mention of seeking isolation of any area of

9

contamination of concern. Furthermore, the only mention of any area of a "breakthrough"[2] is in the second paragraph on the second page of Mr. Chretien's report. The initial and most obvious problem with this is that it is in the section of the report referring to ozone, not formaldehyde, and that the "general air sampling" referenced, according to Mr. Chretien's report, "was performed in order to determine if any residual levels of ozone could be detected within the residence."

Obviously this references ozone testing not formaldehyde testing. Second, as noted in the beginning of that sentence and the fourth sentence of that paragraph, the testing was in regard to potential residual ozone from ozone generators, not the range, placed in the residence by the insurance company. In fact, Mr. Chretien "suspects" that to be the case. Thus, this "breakthrough" did not determine where the contaminates, other than ozone, were and determine they were closest to the Tappan range or even related to it. Arguably though, Plaintiffs might be correct that the "breakthrough" did determine "what the contaminate actually was." However, it was ozone, not formaldehyde, and the suspected source was ozone generators not the Tappan range.

Thus, the Court agrees with the Defendant that use of the PID results is not a reliable measure of formaldehyde as opposed to other VOCs and Mr. Chretien's use of the PID readings, levels, and results to support his opinions do not constitute relevant, proper, reliable, or sufficient data upon which to make these opinions.

C.   **Testimony Regarding the Self-Cleaning Cycle**

The Defendant also takes issue with Mr. Chretien's opinion in his report that "[i]f the unit were to heat to temperatures near or similar to those temperatures found during a self-cleaning cycle

---

[2]This term is not defined by the Plaintiffs, but Mr. Chretien's report indicates that the "containment of concern" was found not only on the front of the filter but also on the back.

10

as a result of a 'relay sticking' then the levels of formaldehyde would exceed not only the NIOSH REL-TWA limits but also those exposure limits mandated by OSHA." [Doc. 86 at 14]. The Defendant contends there is no scientific or factual basis for this statement, and the statement is merely a hypothetical statement, unsupported by the facts or any scientific basis. The Defendant contends that Mr. Chretien's sole stated support for this opinion is his view of the A&E Factory Service documents, which were not attached to the expert disclosure report or provided to the Court.[3]

The Plaintiffs only response is that the A&E Factory Service documents were earlier provided to the Defendant and that "Mr. Chretien's opinions regarding OSHA violations are supported on sound scientific principles." [Doc. 95 at 5]. Further, the Plaintiffs take the position that, "The issue of OSHA, NIOSH, and other standards of measurements for certain VOC's, including formaldehyde, has been provided in this case, and confirmed through the deposition of testimony of Plaintiff's expert, Scott VanEtten." [Doc. 95 at 5].

As with the Plaintiffs' other responses, the Plaintiffs offer no reference or support for their blanket contentions that Mr. Chretien's opinions are based upon "sound scientific principles." Further, the argument that the issue of the standards for measuring VOCs "has been provided" and confirmed" is not an argument at all. It is not responsive to the Defendant's motion or contentions that what has been provided does not have a scientific or factual basis.

The only evidence before the Court is Mr. Chretien's statement in his report, which is not further addressed in his Affidavit, that during his testing: (1) he heard a "repetitive" noise similar to

---

[3]The Plaintiffs may have provided the A&E Factory Service documents to the Defendant, but the Defendant is correct that they have not been provided to the Court. Whether the documents would have provided sufficient support for the Plaintiffs' position and Mr. Chretien's opinion is obviously unknown, but doubtful.

11

that of a faulty relay; (2) Plaintiffs provided documentation from an A&E Factory Service technician noting his trouble-shooting of the Tappan range; and (3) the technician made a determination that the unit was overheating due to a relay sticking.

Giving the Plaintiffs the benefit of an argument they did not make but seems appropriate, it also appears from Mr. Chretien's Affidavit that during Mr. Chretien's testing he determined certain alleged[4] formaldehyde levels. The highest of these levels was found when the range was in the self-cleaning mode. Apparently, in an attempt to bootstrap these two items together, Mr. Chretien opined in his report that "if" the range were to heat to self-cleaning heat temperatures as a result of a relay sticking, then the formaldehyde levels would exceed NIOSH and OSHA exposure limits.

Again, the problems with this opinion are legion. First and foremost, it is a hypothetical opinion without a basis in fact. There is no evidence in the record of the range heating to self-cleaning temperatures. The mere reference to the documents of a technician, whose qualifications are unknown, is hardly adequate factual support for his opinion, especially when the Court does not know when the technician performed his trouble-shooting or to what extent the range was overheating. Likewise, his statement that he heard a "repetitive noise" similar to a faulty relay neither supports the fact that it was a faulty relay, nor does it support a finding of overheating or overheating that ever approached temperatures found during a self-cleaning mode.

The Defendant contends there is no indication that Plaintiffs' ever used the self-cleaning mode, the Plaintiffs did not contend that they used it, and when the Court asked counsel for the Plaintiffs at the motion hearing, he confirmed that the Plaintiffs did not use the self-cleaning cycle.

---

[4] Alleged because of the substance of the Court's analysis above, which discusses the PID measuring all VOCs not just formaldehyde.

Even if the Court were to credit Mr. Chretien's opinion that "if" the oven heated to those temperatures and "if" it did so because of a faulty relay and therefore formaldehyde levels would exceed certain standards, there is simply no proof in the record that the oven ever did heat to such temperatures or that Plaintiffs' were, thus, ever exposed to such formaldehyde levels. Thus, there would still be no relevant, admissible basis for an opinion that bears no relationship to the facts of this case. Such evidence would not pass muster as evidence of causation for the same reasons.

Rather, it seems to the Court that this hypothetical opinion was arrived at as the Plaintiffs' expert's only recourse. In carefully reviewing the various affidavits, it appears that Defendant's expert Mr. Watson and Plaintiffs' expert Mr. Chretien agree as to the standard formaldehyde exposure levels issued by OSHA, ACGIH, and NIOSH. They agree that the standards provide the following formaldehyde exposure levels:

| | |
|---|---|
| OSHA (Permissible exposure level) | .75 parts per million / 750 parts per billion |
| OSHA (Short-term exposure level) | 2 parts per million / 2000 parts per billion |
| ACGISH (Threshold limit values) | .3 parts per million / 300 parts per billion |
| NIOSH-REL-TWA (recommended exposure limit– time weighted average) | .16 parts per million / 16 parts per billion |

While they may disagree on which of these standards and levels is applicable to and appropriate for consideration in this case, it is the results that interest the Court.

Even according to Mr. Chretien's testing and even assuming for the sake of argument that the levels he recorded were all formaldehyde, his Affidavit [Doc. 86 at ¶ 7-8] indicates the following:

| Date | Condition | Formaldehyde Level |
| --- | --- | --- |
| April 2, 2010 | Range apparently off | 130 parts per billion (ppb) |
| April 2, 2010 | Outside house | 4 ppb |
| April 3, 2010 | Range on 1 hour | 188-277 ppb |
| April 3, 2010 | Oven on broil | 187-199 ppb |
| April 3, 2010 | Self-cleaning mode on | 216-401 ppb |
| April 3, 2010 | Self-cleaning mode on 6 minutes | 871-3500 ppb |
| April 3, 2010 | After range off, in living room | 283 ppb (avg.) |

Thus, under his own testing, the Tappan range never exceeds the OSHA standards or ACGIH standards unless it is in the self-cleaning mode.

To establish an exposure level exceeding OSHA's or ACGIH's permissible threshold levels, it would require the range to be used in self-cleaning mode. Since there is no evidence the Plaintiffs ever used the self-cleaning mode, the only way to make a case is to opine hypothetically, "if" it got that hot then the levels would be exceeded. However, there is no evidence of that occurring either. The last option is to state that the Plaintiffs alleged that they had some type of overheating problem in the past, allegedly due to a faulty relay. Mr. Chretien incorporates such a statement into his opinion, but he offers no evidence or basis that a faulty relay exists, beyond a noise, nor does he offer evidence that if a faulty relay does or did exist that it would allow overheating to the temperatures reached during the self-cleaning mode. All Mr. Chretien says is "if it did." This statement is insufficient for passing muster as expert opinion testimony in the Court's opinion.

It should be noted that the readings do all show alleged formaldehyde levels exceeding the very low NIOSH standard. However, there are four problems with this. First, the reading themselves come from the PID that measures all VOC and not just formaldehyde. It has been discounted by Defendant's experts, Plaintiffs' other expert, and the Court, see supra at 6-7, as a reliable measure of formaldehyde in the air.

Second, even if they did exceed the NIOSH standards, there has been no showing that the NIOSH standard, as opposed to the OSHA or ACGIH standard, is the appropriate standards. The Defendant's expert Mr. Watson says NOISH is not the appropriate standard and is inappropriate outside the workplace. [Doc. 73-3 at ¶ 13]. If Mr. Chretien had opined that it was the appropriate standard, the Court might find this dispute to be a question of fact.[5] However, the Plaintiffs have provided no such support or evidence, nor does Mr. Chretien state why he used the NIOSH and does not discuss its appropriateness for his evaluations. Accordingly, the undisputed evidence before the Court is that the NIOSH standard is not the appropriate standard for consideration in this case and the Plaintiffs have provided no response or rebuttal to that contention.

Third, even if it was an appropriate standard for evaluating the levels in this case, there is no evidence in the record that the ranges exceeding NIOSH standards consitutes a defect for the purposes of this action or a breach of any duty or warranty owed to the Plaintiffs.

---

[5]The Court notes that in the Plaintiffs' Response to the Defendant's Motion for Summary Judgment, Plaintiff addressed this issue by stating, "However Plaintiffs' expert submitted that the appropriate standard is the NIOSHA [sic] standard, which is a more recent standard applicable to residential areas." [Doc. 86 at 5 (citing Chretien Report)]. Again, the Court has reviewed Mr. Chretien's report and his Affidavit and finds no such statement. Indeed, there is no reference to any different NIOSH(A) at all and no mention of it being a more recent standard or applicable to residences. Most importantly, there is no statement that the NIOSH standard is the appropriate standard to consider.

Fourth, even if exceeding the NIOSH standards was appropriate for consideration in this case, there is no evidence that the levels of VOCs, even if they were formaldehyde, recorded by Mr. Chretien as exceeding NIOSH standards caused Plaintiffs' injuries. There is no evidence that they are even capable of causing the Plaintiffs' injuries, and again, the only evidence in the record is to the contrary.

For the four reasons stated above, evidence of exceeding the NIOSH standards would be irrelevant.

## V. CONCLUSION

Therefore, based on the record as a whole, it appears that any opinion by Mr. Chretien regarding the amount of formaldehyde within the Plaintiffs' residence must be excluded as they have not been shown to have been properly or scientifically derived. Mr. Chretien's opinions are not based on reliable data or information, and they are not the product of reliable principles and methods. No reliable principles or methodology were applied in this case. Accordingly, Mr. Chretien's testimony regarding the amount of formaldehyde is excluded.

Further, any opinion testimony regarding formaldehyde or levels of volatile organic compounds when and if the Tappan range is in the self-cleaning mode is excluded. Any opinion testimony that if the Tappan range reached temperatures similar to the self-cleaning mode due to a faulty relay or opinion testimony regarding formaldehyde levels exceeding NIOSH standards are all also excluded as factually unsupported and legally irrelevant. Mr. Chertien's opinions do not meet the standards outlined in Rule 702 of the Federal Rules of Evidence and do not meet the threshold laid out in <u>Daubert</u>, and therefore, the Court must exercise its gatekeeper function and exclude this

16

testimony, see Kumho Tire, 526 U.S. at151-52.

Based upon the foregoing, the Court finds Defendant Electrolux's Motion to Exclude Testimony of Plaintiffs' Putative Expert Roland Chretien, III, **[Doc. 91]**, is well-taken, and it is **GRANTED**.

**IT IS SO ORDERED**.

ENTER:

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge